UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

EDGAR MARTINEZ

No. 04 CR 543

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

In 2004, federal agents confronted Edgar Martinez because of an alleged role in a drug conspiracy. They executed a search warrant at his home, seized four kilograms of cocaine, a gun, and $80,000 in cash, and arrested him. The agents did not process and present him to the magistrate judge because he waived his right to presentment and agreed to cooperate. After an initial period of cooperation, Martinez moved to Mexico. His attorney and the agents lost contact with him, some months passed, and the grand jury indicted Martinez. The FBI entered a new arrest warrant into a database, but Martinez was not arrested and arraigned on these charges until 2018. Martinez moves to dismiss the indictment based on the fourteen-year delay. *See* U.S. Const. amend. VI ("the accused shall enjoy the right to a speedy and public trial").[1]

---

[1] Martinez did not file his motion to dismiss under Federal Rule of Criminal Procedure 12(b)(3)(A)(iii) until after the deadline set for the filing of pretrial motions. The motion is untimely. Fed. R. Crim. P. 12(c)(3). But the government does not object on the basis of untimeliness, and the receipt of discovery materials after the deadline gives the defendant good cause for the late filing. *See* [97] at 15. Bracketed numbers refer to entries on the district court docket and page numbers are taken from the CM/ECF header placed at the top of filings.

**I.     Facts**

In 2004, interceptions over court-authorized wiretaps, agent surveillance, and a seizure of 30 kilograms of cocaine implicated Martinez in a drug-trafficking conspiracy. [98-1].[2] Agents obtained a search warrant for Martinez's home and an arrest warrant (docketed as case number 04 CR 720 (N.D. Ill.)). On August 11, 2004, agents executed the warrants. [106-1] at 2. They found a gun, four bricks of cocaine, and $80,000 in cash. [106-1] at 3; *United States v. Martinez*, 04 CR 720, Dkt. No. 6 ¶ 2 (N.D. Ill.). Martinez later met with FBI agents and an Assistant United States Attorney and waived timely presentment to the magistrate judge. [106-2] at 2. He was represented by an attorney and agreed to cooperate with agents. *Id.*

In the weeks that followed, Martinez cooperated by consenting to interceptions over his phones, making detailed statements about his drug dealing, relaying information from his contacts, and recording meetings. [106-2]; [106-3]; [106-4]. In September 2004, the government dismissed the arrest warrant against Martinez. *Martinez*, 04 CR 720, Dkt. No. 6 ¶ 3. By November 2004, however, Martinez stopped all contact with the agents. *Martinez*, 04 CR 720, Dkt. No. 6 ¶ 4. On November 9, 2004, the grand jury returned a superseding indictment in this case, 04 CR 543,

---

[2] Martinez and the government each submitted evidence and proffered facts in their briefs, but neither side requested an evidentiary hearing. I make findings of fact based on the evidence submitted and reasonable inferences I draw from that evidence. I also credit certain assertions in the briefs where there is no dispute about their accuracy.

adding Martinez as a defendant, and a new bench warrant issued for his arrest. [23]; [25]. Martinez says he moved to Mexico in 2004. [97] at 3.[3]

On November 12, 2004, agents entered the new arrest warrant for Martinez into the National Criminal Information Center database and told Martinez's mother and brother that there was a warrant for Martinez's arrest. [98] at 8. He returned to the United States in 2011, because he feared the drug cartel in Mexico more than going to a U.S. prison. [97] at 3; [98-4] at 3. Martinez says that upon his return he was living in Addison, Illinois, under his legal name, [97] at 3, but in November 2011, Martinez obtained an Illinois identification card in the name Juan Rodriguez. [98] at 11; [98-2] at 3–4. He knew he was a fugitive and that was why he paid $3,000 for the ID in a false name. [98-4] at 3.[4] Martinez did not file tax returns after he returned to

---

[3] Martinez submitted a printout from United States Citizenship and Immigration Services documenting border crossings under the name Edgar Martinez and using the same birthdate that Martinez used to obtain his Illinois identification in 2016. The printout reflects a crossing on August 11, 2004, see [97] at 3, but I do not credit it as a border crossing of this defendant. The FBI records are more persuasive in establishing that Martinez was present at his home at 6 a.m. on August 11, 2004, and then was present in this district for the next several days cooperating with agents. Without any explanation of the meaning of the entries in the USCIS printout, I give the August 11, 2004 entry no weight (and I give no weight to the reference to some contact with TSA in 2005; Martinez offers no corroborating evidence that he flew Venezuelan airlines in 2005 or that the travel would have reasonably prompted any further United States government inquiry). I do not know precisely when in 2004 Martinez moved to Mexico, but it occurred sometime after August 31, 2004, see [106-4] at 10, and most likely right around his November 9, 2004 indictment. See [98] at 7 (reporting that on November 12, Martinez's brother said he found a note from Martinez about three days earlier saying he left the area).

[4] Martinez asserts in his brief that he had no reason to believe he was a fugitive because the warrant in 04 CR 720 had been dismissed. [102] at 3. But that is not what Martinez told agents—he admitted that he knew he was a fugitive and he returned to the United States to see if federal agents were going to catch him. [98-4] at 3. I credit his statement to agents. He knew he was wanted by the FBI.

this country until 2017, for tax year 2016.[5] In January 2012, the Illinois Secretary of State's office's facial recognition program indicated that the same person could have IDs under the name Edgar Martinez and Juan Rodriguez. [98-2] at 2. That office opened an investigation but found no warrants in the NCIC system. *Id.* It took no action, keeping "all stops in effect" on the drivers' licenses and ID cards at issue "until the subject comes forward to provide documentation as to true identity" and closed the file. *Id.*

Martinez was using the Rodriguez identity in February 2012 when he was stopped by East Chicago, Indiana police officers in a traffic stop. [106-5] at 2. The officers ran the Rodriguez name and learned that there was a warrant for Rodriguez's arrest. *Id.* Martinez's fingerprints had not been entered into the system when he was arrested in 2004, [106] at 2, so when the East Chicago officers fingerprinted him (under Rodriguez's name), they were able to determine only that he was not the real Juan Rodriguez. [98-4] at 3. They released him. *Id.* Martinez claims he was living openly under his legal name and that federal authorities "presumably" were contacted by the East Chicago police yet did nothing. [97] at 3. I reject these claims. Although Martinez may have used his true name for some purposes, the evidence is that he was using the false Rodriguez identity, not filing tax returns, and that East Chicago did not have enough information to justify an alert to federal agents.

---

[5] Martinez submitted his 2016 tax return as an exhibit, dated February 7, 2017, and reflecting his Addison, Illinois address. At a status hearing on September 25, 2019, I asked counsel for Martinez if there were tax returns filed before the tax year 2016, and counsel replied there were none.

4

Not until 2016 did Martinez, using his true identity, reveal himself to government agencies. He hired an attorney (not his criminal defense attorney from 2004), and they went to the Illinois Secretary of State's office to sort out the duplicate-identity issue flagged years earlier. [98-2] at 3. Martinez lied to the Secretary of State investigators and said he obtained the Rodriguez identity when he was young and stupid. *Id.* In fact, he got the ID in 2011 because of his fugitive status. [98-4] at 3. Martinez proved his identity to the Secretary of State's office's satisfaction, and it rescinded the cancellation of his Martinez ID. [98-2] at 4–5.[6] Martinez told agents that he hired a lawyer to fix his fugitive status, [98-4] at 3, but there is no evidence that either an immigration attorney or a criminal defense attorney took any steps to clear the warrant for Martinez.

In 2016, Martinez applied for immigration status on behalf of his spouse, using his true name and Addison, Illinois address. [98-3] at 2. The government approved the petition, [97] at 4, and in 2017, Martinez and his spouse filed an online immigrant visa and alien registration application. Defendant's Exh. D. Martinez used his name and Addison address and attached copies of his 2016 tax return. Defendant's Exhs. D & E. He applied for a passport—again using his true name and Addison address. [98]

---

[6] In his 2018 post-arrest statement, Martinez said that the Secretary of State's office told him the FBI was looking for him. [98-4] at 3. In his brief, he asserts that they told him he would be detained because of an outstanding arrest warrant, he surrendered, the FBI was contacted, but no action was taken. [97] at 4. I would expect there to be corroboration of these claims, from either the Secretary of State's file or the FBI, but the Secretary of State investigative file makes no reference to an arrest warrant, [98-2], and the FBI asserts it has no record of a communication from Martinez in 2016. [98] at 17. I find that the FBI was not contacted by either the Secretary of State or Martinez in 2016.

at 14; Defendant's Exh. F. The State Department denied the application in March 2017 because he was the subject of an outstanding arrest warrant from November 2004. [98] at 14; Defendant's Exh. G. The denial letter advised Martinez of his right to a hearing to review the denial and told him he could reapply once he had cleared his warrant. Defendant's Exh. G. Martinez did not appeal or turn himself in. [98] at 14–15. He crossed the U.S. border in May 2017 using his valid Illinois identification card without incident. [98] at 15; [106] at 6. He was not arrested, and I credit the government's representation that border patrol did not check NCIC because Martinez was a U.S. citizen with valid identification. [106] at 6.

It was not until April 2018 that agents arrested Martinez, at the Addison address.

## II. Analysis

The constitutional speedy-trial right is amorphous and slippery, and the only remedy for a violation is dismissal of the indictment—a remedy more serious than the exclusionary rule. *Barker v. Wingo*, 407 U.S. 514, 522 (1972). To test whether the right has been violated, courts evaluate four factors: length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.* at 530. Courts assess prejudice "in light of the interests the Sixth Amendment seeks to protect. The interests are (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *United States v. Bell*, 925 F.3d 362, 376 (7th Cir. 2019) (quoting *United States v. Harmon*, 721 F.3d 877, 883 (7th Cir. 2013)). When

considering the reasons for delay, the government's bad faith or negligence in bringing defendant to trial weighs against it but delay attributable to the defendant weighs against him. *Doggett v. United States*, 505 U.S. 647, 656–57 (1992); *United States v. Arceo*, 535 F.3d 679, 686 (7th Cir. 2008).[7] Both sides bear a burden: "the longer the delay and the more vigorous the defendant's demand to be tried speedily, the more reason the state must show for the delay and the less harm (of whatever type) to himself the defendant need show." *United States ex rel. Mitchell v. Fairman*, 750 F.2d 806, 808 (7th Cir. 1984); *see also Loera v. United States*, 714 F.3d 1025, 1032 (7th Cir. 2013).

The delay from 2004 to 2018 is presumptively prejudicial. *See Bell*, 925 F.3d at 376 (delay greater than one year is presumptively prejudicial) (quoting *United States v. O'Connor*, 656 F.3d 630, 643 (7th Cir. 2011). The reasons for most of the delay fall on Martinez. He fled to Mexico knowing that he was the target of an investigation. It was his choice to avoid trial. When he returned in 2011, he did not assert his rights to a trial, did not contact his handlers from the FBI, and no lawyer on his behalf reached out to criminal authorities to surrender on or clear the warrant. Although a

---

[7] Upon a defendant's demand, the government is under a "'constitutional duty to make a diligent good faith effort' to locate and apprehend a defendant and bring that defendant to trial." *United States v. Deleon*, 710 F.2d 1218, 1221 (7th Cir. 1983) (quoting *Smith v. Hooey*, 393 U.S. 374, 383 (1969)). There was no demand here, but diligence remains a factor in evaluating the reasons for delay. Negligence weighs against the government. Knowledge of a defendant's location by local authorities is not automatically imputed to the federal government, and if the federal government did not know the defendant's whereabouts because of the defendant's status as a fugitive, the delay does not weigh against the government. *Deleon*, 710 F.2d at 1221.

7

search of the docket in 04 CR 720 would not have told Martinez about the indictment and warrant in 04 CR 543, he admitted that he knew he was fugitive—he didn't need any more information. And even though a lawyer may have told him that he had no problems if he was able to cross the border, Martinez still expected to be arrested someday. *See* [98-4] at 3–4. He obtained an alias ID because he knew he was a fugitive. All of this indicates that Martinez was actively avoiding apprehension. He got lucky in January and February 2012, when local officials were unaware of his federal troubles, but he did nothing to draw federal attention until 2016.

His luck continued because parts of the federal government knew about Martinez and his location in 2016, yet he wasn't arrested. If the FBI were actively looking for Martinez, they likely could have found him after 2016, when he started pursuing immigration options for his spouse. In 2017, USCIS knew about Martinez, where he lived, and the fact that there was a warrant for his arrest. The IRS knew of his existence when he filed a return in 2017, for tax year 2016. He crossed the border in 2017 using his true identity. It seems only his contact with the Illinois Racing Board in 2018 prompted the FBI to dust off the file and look for him. *See* [97] at 6. There is no evidence that the federal government acted in bad faith, but the two-year delay from 2016 to 2018 is partially the result of government negligence. Martinez was partially responsible too, because he knew the whole time that he was wanted and did nothing to formally address the situation. Nevertheless, the government missed opportunities to catch him.

The delay from 2004 to 2016 is mostly attributable to Martinez's efforts to avoid apprehension, and so by the time the government could reasonably have found him, any impairment in his defense from the delay had already occurred. There has been no showing of any particularized trial prejudice from the 2016 to 2018 delay. Two years is still a long time but not as long as the negligence-based delay in *Doggett*, 505 U.S. at 657–58. And Martinez still bears some responsibility for the recent delay. In such a case, Martinez must point to some actual prejudice to justify dismissal of the indictment. *See Bell*, 925 F.3d at 376 (when delay is primarily attributable to defendant, he must show specific testimony that witnesses would have offered but were unable to offer by the time of trial that would have helped the defense) (citation and quotation omitted). It is not enough to speculate or allege generally that witnesses' memories fail. *Id.*; *United States v. Thomas*, 933 F.3d 685, 695 (7th Cir. 2019) (rejecting defendant's speculation about effect of delay).

Martinez was not jailed during the delay and was not subjected to anxiety outside of his control (he could have turned himself in). So the only possible component of prejudice applicable here is the impairment of his defense. He argues that there is a distinct possibility of prejudice because his co-defendants might not be available as witnesses. [97] at 18. But he makes no argument that his co-defendants would be favorable to his defense. One co-defendant admitted that Martinez was the supplier of the 30 kilograms of cocaine, [52] at 4, and the other co-defendant confirmed Martinez's role in statements to prosecutors. [98] at 10–11. Their absence from trial hurts the government more than Martinez. To the extent the government's

9

proof is based on wiretap interceptions, seizures, and law enforcement surveillance, Martinez can attack that evidence today with the same techniques available to him in 2004.

Fourteen years to await trial is a long time, but it is not too long when most of that time passed because the defendant intentionally avoided detection and he cannot point to actual prejudice from the delay. The government could have shortened the delay with a more diligent manhunt, but because Martinez has not demonstrated any actual prejudice, the government's failures were not so sloppy that his constitutional right to a speedy trial was violated. Martinez's motion to dismiss [97] is denied.

ENTER:

Date: November 6, 2019

Manish S. Shah
U.S. District Judge